**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SPECTRANET TECHNOLOGIES LLC, <br><br> Plaintiff, <br><br> v. <br><br> RAFT TECHNOLOGIES LTD and 3DB COMMUNICATION INC., <br><br> Defendants. | Civil Action No. 1:26-cv-05870 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff SpectraNet Technologies LLC ("SpectraNet") brings this action for patent infringement under 35 U.S.C. § 1 *et seq.*, against Defendants and Raft Technologies Ltd and 3DB Communication Inc. (collectively, "Defendants") and alleges as follows:

**NATURE OF THE CASE**

1. This action arises under 35 U.S.C. § 271 for Defendants' infringement of SpectraNet's U.S. Patent Nos. 10,959,123 (the "'123 Patent"); 11,516,694 (the "'694 Patent"); and 12,414,002 (the "'002 Patent") (collectively, the "Patents-in-Suit").

**PARTIES**

2. SpectraNet is a Delaware limited liability company with its principal place of business at 5830 Granite Parkway, Suite #100-216, Plano, TX 75204.

3. Defendant Raft Technologies Ltd ("Raft") is an Israeli limited company with a principal place of business at 25 HaBarzel St. Tel Aviv, 6971035, Isreal.

4. Defendant 3DB Communication Inc. ("3DB") is a Delaware corporation. On information and belief, 3DB is a wholly owned subsidiary of Raft. 3DB may be served through

its registered agent Corporation PHS Corporate Services, Inc. at 1313 Market Street, Suite 1000, Wilmington, DE 19801.

## JURISDICTION AND VENUE

5. This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35 U.S.C. § 1 *et seq.*

6. This Court has subject matter jurisdiction over SpectraNet's claims under 28 U.S.C. §§ 1331 and 1338(a).

7. Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

8. On information and belief, Defendant 3DB has a regular and established place of business in this district. 3DB operates multiple microwave antenna transmitters and receivers located within this District including at 47W543 Perry Road, Maple Park, Illinois; 31W478 Diehl Road, Naperville, Illinois; and 44W537 Welter Road, Virgil, Illinois.

9. Defendant 3DB also operates multiple antenna transmitters for transmitting communications in the shortwave frequency spectrum. One such location is at 47W543 Perry Road, Maple Park, Illinois.



10.    Defendant 3DB also operates an antenna array at 44W537 Welter Road, Virgil, Illinois, which includes antennas for transmitting in the shortwave spectrum.



11.    Defendants Raft and 3DB recruits full-time workers within this District to work for its "Chicago Hub Sites."

**About Raft**

Employer: 3DB Communication Inc (on behalf of Raft Technologies)

Raft Technologies, in collaboration with 3DB Communication Inc, is revolutionizing global connectivity by harnessing cutting-edge Skywave radio frequency technology to create the world's fastest low-latency wireless network. We push the boundaries of communication speed, approaching the ultimate limit of light itself. Raft operates ultrafast data links connecting key destinations across continents, focusing on transatlantic routes and linking major financial hubs worldwide.

**About The Position**

We are seeking an experienced **Field Communications Engineer (1099 Contract)** to join our team in the Chicago area. This role combines technical expertise in RF systems with project management in the telecommunications and infrastructure sector.

**Location:** Maple Park and Naperville, IL area

**Responsibilities**

**Technical Support for Chicago Hub Sites:**

*See* https://talents.vaia.com/companies/raft-technologies/field-communications-engineer-37145018/ (last visited May 19, 2016).

12.     These locations are used, have been used, and are continued to be used to conduct Defendant 3DB's business to provide data links between major financial hubs, like the Chicago Mercantile Exchange, across the Atlantic Ocean in collaboration with Defendant Raft. On information and belief, 3DB owns or leases the land upon which these antenna stations are located.

13.     Defendant 3DB thus conducted and continues to conduct its business in this District and has committed and continues to commit acts of patent infringement in this District, including at the locations of its antenna stations. Defendant 3DB directly or through subsidiaries or intermediaries (including the other Defendant in this lawsuit) performs the claimed methods of the Patents-in-Suit in the United States and in this District and/or contributes to and actively induces its customers and others to perform the claimed methods of the Patents-in-Suit in the United States and in this District.

COMPLAINT FOR PATENT INFRINGEMENT                                                              4

14.     Defendant 3DB directly or through subsidiaries or intermediaries (including the other Defendant in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District and/or contributes to and actively induces its customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise infringing products and/or services in the United States and in this District.

15.     This Court has both general and personal jurisdiction over 3DB. 3DB has committed acts within this District giving rise to this action and has established minimum contacts within this forum such that the exercise of jurisdiction over 3DB would not offend traditional notions of fair play and substantial justice.

16.     Defendant Raft is a foreign company headquartered in Israel. Defendant Raft provides its customers an end-to-end communication service that connects key destinations in the United States, Europe, and Asia using high frequency radio signals to establish direct wireless links between two antennas. *See Raft Technologies*, https://raft-tech.com/ (last visited May 19, 2016).

17.     Defendant Raft's website demonstrates that it maintains an antenna station in Chicago.



*See* https://raft-tech.com/bulletin/record-high-availability/.

18.     Defendant Raft has also publicly touted Chicago as one end of its "end-to-end" system.



*See* https://www.youtube.com/watch?v=NXAMTsQKvwU&t=587.

19. Defendant Raft also maintains a "team" in this District and advertises job opportunities in this District.



See https://web.archive.org/web/20250521083746/https://raft-tech.com/careers/.

20. Defendant Raft thus conducted and continues to conduct its business in this District and has committed and continues to commit acts of patent infringement in this District. Defendant Raft directly or through subsidiaries or intermediaries (including the other Defendant in this lawsuit) performs the claimed methods of the Patents-in-Suit in the United States and in this District and/or contributes to and actively induces its customers and others to perform the claimed methods of the Patents-in-Suit in the United States and in this District.

21. Defendant Raft directly or through subsidiaries or intermediaries (including the other Defendant in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports,

and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District and/or contributes to and actively induces its customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise (including the provision of interactive web pages) infringing products and/or services in the United States and in this District.

22. This Court has both general and personal jurisdiction over Defendant Raft. Defendant Raft has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant Raft would not offend traditional notions of fair play and substantial justice.

23. Defendants in this action also work collectively as part of a common enterprise such that they are responsible for each other's conduct. Defendant 3DB is a subsidiary of Defendant Raft and Defendant Raft controls the conduct of Defendant 3DB.

24. Defendant 3DB has identified Defendant Raft as the "Real Party in Interest" in connection with licenses obtained from the FCC.

25. Defendant Raft's CEO is identified as the "Director" and "CEO" of Defendant 3DB, and has signed binding contracts as the representative of Defendant 3DB.

## THE ASSERTED PATENTS

26. The '123 Patent, entitled "Low Latency Wireless Messaging," issued on March 23, 2021. A true and correct copy of the '123 Patent is attached as **Exhibit 1**.

27. The '694 Patent, entitled "Low Latency Wireless Messaging," issued on November 29, 2022. A true and correct copy of the '694 Patent is attached as **Exhibit 2**.

28. The '002 Patent, entitled "Low Latency Wireless Messaging," issued on September 9, 2025. A true and correct copy of the '002 Patent is attached as **Exhibit 3**.

29.     Plaintiff SpectraNet is the owner of the '123 Patent, the '694 Patent, and the '002 Patent, and has the exclusive right to sue and collect remedies for past, present, and future infringements of same.

## BACKGROUND

30.     SpectraNet incorporates the allegations of the foregoing paragraphs as if fully restated herein.

31.     The inventions patented in the Patents-in-Suit originate from the groundbreaking work of Mr. Jeffrey Adams. In some applications, milliseconds make the difference between earning and losing millions of dollars. Mr. Adams was focused on developing the fastest possible systems and methods for reliably communicating small pieces of information over long distances.

32.     Message latency refers to the length of time it takes a message to traverse a system. Mr. Adams was insightful enough to realize that multiple factors contribute to message latency, including propagation latency—the time it takes to send a message between two points—and message size latency—the time required to process the message before and after it is received.

33.     Regarding propagation latency, Mr. Adams realized that radio waves offered benefits other mediums could not match. First, radio waves are fast. Radio waves travel through the air at nearly the speed of light while light in fiber optic cables travels at approximately 67% of the speed of light. And second, while lower frequency radio waves have line of sight limitations, higher frequency, ionospheric transmissions allow messaging over long distances, even across oceans.

34.     But this was only one piece of the puzzle. While the ionospheric transmission medium offered benefits in propagation latency, it posed problems in message latency. The processing time for ionospheric radio wave transmissions is much greater than other mediums like fiber optic cables. Propagation latency gains provided by ionospheric transmissions were quickly consumed by losses in message latency as the size of the message increased. Mr. Adams found an elegant way to address this issue. He realized that he could favorably effect message latency in ionospheric communications with encoding that was known by the receiving device thereby reducing bit-by-bit processing that was eating up the latency gains.

35.     Ionospheric transmissions also pose reliability problems because they are sensitive to ever-changing environmental conditions that can diminish or eliminate the latency advantage. This problem was addressed by selecting and controlling physical-layer transmission parameters (e.g., carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints.

36.     The '123 Patent is generally directed to methods, systems, and devices for RF transmission in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum band to a remote receiving device. A request for a particular action is received, and a particular value is encoded using a format derived to effect message latency into a message for transmission, where the particular value is known in advance to the remote receiving device as corresponding to the particular action.

37.     The claims of the '123 Patent include determining transmission parameters for the wireless transmission based at least on a message latency and a predefined channel bandwidth, and controlling transmission of the encoded message using the determined transmission

parameters. Example transmission parameters and constraints are identified, such as carrier frequency, modulation type, transmission power, sampling rate, and buffer size. The '123 Patent describes message latency concepts that include propagation-related considerations from origin to destination, including latency caused by radios, amplifiers, antennas, and related equipment.

38. The '694 Patent is generally directed to methods and devices for transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message; encoding the particular message into an encoded message using a format derived to effect message latency, where the encoded message is known in advance to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message; determining transmission parameters based at least on message latency and a predefined channel bandwidth; and transmitting the encoded message using the determined transmission parameters.

39. The '694 Patent describes example transmitter-side components, including a "front end unit" adapted/configured to receive messages for wireless transmission (including, in certain embodiments, requests for financial transactions) and a controller adapted/configured to determine transmission parameters for low-latency transmission based at least on message latency and predefined channel bandwidth.

40. The '002 Patent is generally directed to methods and devices for RF transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message toward a remote receiving device; encoding the particular message into an encoded message using a format

derived to reduce message latency (where the encoded message is known in advance to the remote receiving device as representing the particular message and is smaller than the particular message); and transmitting the encoded message over a frequency in an ionospheric band using one or more transmission parameters selected based on estimated propagation latency and based on a predefined channel bandwidth for transmission over the ionospheric band.

41. The '002 Patent's claims further describe that estimated propagation latency for the transmission parameters may be determined for multiple transmission parameters and may be based on factors such as time of day, time of a solar cycle, time of year, number of bounces between earth and the ionosphere, and distance.

42. The '002 Patent also includes claims directed to receiver-side methods, including receiving an encoded message transmitted via the ionospheric band according to transmission parameters selected based on estimated propagation latency and chosen channel bandwidth; decoding the encoded message into a decoded message known in advance by the receiving system as corresponding to the encoded message (with the decoded message longer than the encoded message); and performing an action based on decoding the encoded message.

43. The Patents-in-Suit are directed to patent-eligible, non-abstract subject matter. The claims of the Patents-in-Suit are directed to methods, systems, and devices for reducing latency in the communication of encoded messages via an ionospheric band. The claims focus on specific, technological improvements in wireless communications—namely, reducing end-to-end message latency by (i) encoding messages into compact representations that are known a priori to a receiving device (thereby reducing message-size-related latency), and (ii) selecting and controlling concrete, physical-layer transmission parameters (*e.g.*, carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and

channel-bandwidth constraints applicable to ionospheric communications. The claims of the Patents-in-Suit describe and claim concrete, engineering-driven techniques for reducing latency in RF transmissions, implemented in the operation of RF communication systems including ionospheric transmissions.

## ALLEGATIONS OF PATENT INFRINGEMENT

44.     Defendants, jointly and/or individually, make, use, sell, offer for sale, and/or import certain products, services, and systems.

45.     Defendants deploy ultra-low latency and transcontinental communication systems designed to serve firms in the High Frequency Trading ("HFT") market.

46.     In the HFT market, speed is critical.  Lowering the latency of sharing trading information gives HFT firms an advantage by allowing them to capitalize on small changes in commodity prices before other traders have time to react. For example, if the price of a commodity goes up in a U.S. market, HFT traders can trigger a "buy" trade overseas, such as in Japan or Europe, before the overseas markets have time to react and the overseas prices go up. This is known as latency arbitrage.

47.     While the monetary benefit for any given trade may be minimal, HFT traders use high-volume trading to leverage small profits into cumulatively huge gains.

48.     It has been estimated that HFT constitutes more than 50% of trading volume in U.S. markets. *See* Anirban Banerjee & Prince Roy, *High-Frequency Traders' Evolving Role as Market Makers*, 82 PAC. BASIN FIN. J. (2023), https://www.sciencedirect.com/science/article/abs/pii/S0927538X2300255X.

49.     This opportunity for large profits has produced fierce competition in the HFT market among players seeking to gain millisecond, microsecond, or even nanosecond advantages over their competitors.

50.     HFT firms have invested hundreds of millions of dollars developing networks that save fractions of a second. *See, e.g.*, Christopher Steiner, *Wall Street's Speed War*, FORBES (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html; *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, CBC NEWS (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

51.     Technical analysis verifies that HFT traders are commercially utilizing the High Frequency spectrum ("shortwave") communications to trade in the financial markets. This can be deduced from the time it takes overseas markets to react to changes in U.S. markets. In one analysis performed by the Head of Quantitative Analytics for the Deutsche Börse Group, the reaction time was measured between the Chicago Mercantile Exchange and the Eurex Exchange near Frankfurt, Germany. The analysis revealed a large volume of trades occurring 9 milliseconds faster than possible using the best alternatives like optical fiber. This phenomenon was first observed in 2020 and grew to dominate trading performed at the slower speed. *See, e.g.*, Stefan Schlamp, *The Long and The Short End of the Latency Spectrum*, Deutsche Börse Group (Sept. 21, 2023), https://www.deutsche-boerse.com/resource/blob/3690190/b99127ac79c1b2753206c4df5140a535/data/Open%20Day%202023%20%20Presentation,%20The%20Long%20&%20Short%20End%20of%20The%20Latency%20Spectrum.pdf.

52.     Shortwave trading activity has similarly been identified between the Chicago and Tokyo trading markets. *See* Stephen Tyc, *Market Data vs. Private Fills*, YouTube (Oct. 18, 2022, at 18:15), https://www.youtube.com/watch?v=a_Awz6eC0NU.

53.     The volume of trading indicates that shortwave trading activity is being used at a large, commercial scale.

54.     Defendants give their clients access to an ultra-fast wireless network harnessing "Skywave" radio frequency technology that promises to connect global financial hubs.



*See Comparing Low Latency*, https://raft-tech.com/bulletin/comparing-low-latency-solutions/ (last visited May 19, 2026).

55.     Defendants also operate multiple antenna stations transmitting in the shortwave spectrum.

56.     For example, Defendant 3DB operates locations at 47W543 Perry Road, Maple Park, Illinois and 44W537 Welter Road, Virgil, Illinois. *See* https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=143567&license_seq=145364.

57.     According to public filings, both locations reference in the previous paragraph use the call sign WI2XXG.

58.     While shortwave communications provide latency advantages, they also present certain challenges. In particular, shortwave communication can be transmitted at a significantly reduced bandwidth as compared to optical fiber transmissions. *See, e.g.*, David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE Spectrum (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. As a result, the latency advantages provided by shortwave can be reduced if the messages being sent are too long. Thus, shortwave traders tightly encode their prices or other information in just a few bytes or bits or lose their latency advantage. *See* Bob Van Valzah, *Shortwave Trading: Part II*, SNIPER IN MAHWAH BLOG (June 7, 2018), https://sniperinmahwah.wordpress.com/2018/06/07/shortwave-trading-part-ii-faq-and-other-chicago-area-sites/.

59.     Upon information and belief, Defendants jointly and/or individually have used, and continue to use, shortwave signals to provide low latency communications to provide data links between major financial hubs, such as from the Chicago Mercantile Exchange across the Atlantic Ocean.

60.     Further identification of Defendants' accused methods and instrumentalities will be provided in Plaintiff's infringement contentions pursuant to the Court's scheduling order and local rules.

61.     To the extent applicable, SpectraNet has at all times complied with the marking statute, 35 U.S.C. § 287 for each of the Patents-in-Suit.

62.     As set forth below, Defendants individually and/or jointly make, sell, and use, without any license or permission from SpectraNet, technology protected by the Patents-in-Suit.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,959,123

63.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

64.     The '123 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '123 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request for a particular action to be performed;

encoding a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, wherein the particular value is known a priori to the remote receiving device as corresponding to the particular action;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

transmitting the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

65.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '123 Patent, including but not limited to claim 1[1], under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using,

---

[1] Throughout this Complaint, wherever SpectraNet identifies specific claims of the Patents-in-Suit that Defendants infringe, SpectraNet expressly reserves the right to identify additional asserted claims in accordance with the local patent rules. Specifically identified claims throughout this Complaint are provided for notice pleading only and are not presented as "exemplary" claims of the Patents-in-Suit.

COMPLAINT FOR PATENT INFRINGEMENT                                                          17

selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '123 Patent.

66. For example, Defendants' joint and/or individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band to a remote receiving device.



*See* https://www.youtube.com/watch?v=NXAMTsQKvwU&t=587.

67. Defendants jointly and/or individually receive a request for a particular action to be performed. Defendants provide communication links to make trades on the world's financial markets. They have established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago and they transmit communications to remote receiving devices located at other global financial hubs like Frankfurt.

68. Defendants' network is directed toward HFT trading. Upon information and belief, to execute a trade, a request for a particular action to be performed (*e.g.*, buy or sell a certain security) is received by Defendants prior to the transmission of a message in the HF band.

69. Defendants, jointly and/or individually, encode a particular value using a format derived to effect message latency into an encoded message for transmission to the remote

receiving device over a frequency in an ionospheric HF frequency band, where the particular

value is known a priori to the remote receiving device as corresponding to the particular action.

70.     For example, Defendant Raft acknowledges that the messages that it sends are

comprised of several bits, and limited to "indicators."



*See The Basics of HF Data Networks*, available at https://raft-tech.com/bulletin/the-basics-of-hf-

data-networks/ (last visited May 19, 2026).

71.     Defendant Raft has also acknowledged that it encodes particular messages about

the price movement of different financial instruments into encoded messages that are known a

priori to remote receiving devices so that information may be utilized for trading.



*See* Mike Schonberg & Tamir Ostfeld, *No Fiber Required: Wireless Market Data from Chicago*

*to London Using HF,* (June 2020), https://docs.stacresearch.com/system/files/resource/files/GSL-

Spring-2020-Qunicy.pdf.

COMPLAINT FOR PATENT INFRINGEMENT                                                    19

72. Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable trade execution, upon information and belief, the particular value will be known a priori to the remote receiving as corresponding to the particular action to allow trade execution at the remote location.

73. Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth. Defendants' FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned on or more emission designators, and authorized power levels:

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=143567&license_seq=145364.

74. The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that

begins with 96K0 allows a 96 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

75. Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[2] Thus, on information and belief, Defendants select message parameters, such as modulation type and frequency, to meet or beat the latency requirements constraints while complying with licensing constraints such as the predefined channel bandwidth.

76. Defendants, jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

77. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

78. On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of a subsidiary Defendant is actively controlled by the corporate parent. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

---

[2] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

COMPLAINT FOR PATENT INFRINGEMENT <span style="float:right">21</span>

79.     Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce the other Defendant and/or related entities to infringe the '123 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

80.     Defendants have been aware of the '123 Patent at least since May 17, 2021, when an examiner cited U.S. Patent No. 9,215,726 to Defendant Raft during prosecution of Defendant Raft's U.S. Patent Application No. 16/546,326. U.S. Patent No. 9.215,726 is a parent application of the '123 Patent to which the '123 Patent claims priority.

81.     Despite that awareness since May 17, 2021, Defendants continue to infringe and induce others to infringe at least claim 1 of the '123 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '123 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '123 Patent.

82.     SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,516,694

83.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

84. The '694 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '694 Patent recites:

1. A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request to transmit a particular message to the remote receiving device;

encoding the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, wherein the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

transmitting the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

85. Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '694 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '694 Patent.

86. For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device.



*See* https://www.youtube.com/watch?v=NXAMTsQKvwU&t=587.

87.     Defendants jointly and/or individually receive a request to transmit a particular message to the remote receiving device. Defendants provide communication links to make trades on the world's financial markets. They have established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago and they transmit communications to remote receiving devices located at other global financial hubs like Frankfurt.

88.     Defendants, jointly and/or individually, encode the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, where the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message.

89.     For example, Defendant Raft has acknowledged that the messages that it sends are comprised of several bits, and limited to "indicators."



*See The Basics of HF Data Networks*, available at https://raft-tech.com/bulletin/the-basics-of-hf-data-networks/ (last visited May 19, 2026).

90.     Defendant Raft has also acknowledged that it encodes particular messages about the price movement of different financial instruments into encoded messages that are known a priori to remote receiving devices so that information may be utilized for trading.



*See* Mike Schonberg & Tamir Ostfeld, *No Fiber Required: Wireless Market Data from Chicago to London Using HF* (June 2020), https://docs.stacresearch.com/system/files/resource/files/GSL-Spring-2020-Qunicy.pdf.

91.     Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable communication of the particular message, upon information and belief, the encoded message is known a priori to the remote receiving as corresponding to the particular message. On information and belief, these messages are smaller than the particular message to fit within the limited available bandwidth and decrease latency.

92.     Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a)

COMPLAINT FOR PATENT INFRINGEMENT                                                                          25

message latency and on (b) a predefined channel bandwidth. Defendants' FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned on or more emission designators, and authorized power levels:

Frequency     Power     Emission Designator

| Action | Frequency | Station Class | Output Power/ERP | | Mean Peak Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
|---|---|---|---|---|---|---|---|
| Modified | 4438.00000000-4650.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0F1D | FSK |
| Modified | 4438.00000000-4650.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0D7D | OFDM |
| Modified | 4438.00000000-4650.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0D1D | QAM8,16 |
| Modified | 4438.00000000-4650.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0G1D | PSK, QAM4 |
| Modified | 5060.00000000-5450.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0F1D | FSK |
| Modified | 5060.00000000-5450.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0D7D | OFDM |
| Modified | 5060.00000000-5450.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0D1D | QAM8,16 |
| Modified | 5060.00000000-5450.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 96K0G1D | PSK, QAM4 |
| Modified | 5730.00000000-5800.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 48K0F1D | FSK |
| Modified | 5730.00000000-5800.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 48K0D7D | OFDM |
| Modified | 5730.00000000-5800.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 48K0D1D | QAM8,16 |
| Modified | 5730.00000000-5800.00000000 kHz FX | | 10.000000 kW 308.000000 kW | P | 0.00005000 % | 48K0G1D | PSK, QAM4 |

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=143567&license_seq=145364.

93.    The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 96K0 allows a 96 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

94.    Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact

the frequencies available for reliable ionospheric transmissions.[3] Thus, on information and belief, Defendants select message parameters, such as modulation type and frequency, to meet or beat the latency requirements constraints while complying with licensing constraints such as the predefined channel bandwidth.

95. Defendants, jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band using the determined transmission parameters to the remote receiving device.

96. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

97. On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendant is actively controlled by the corporate parent. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

98. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce the other Defendant and/or related entities to infringe the '694 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

---

[3] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

99.     Defendants have been aware of the '694 Patent at least since May 17, 2021, when an examiner cited U.S. Patent No. 9,215,726 to Defendant Raft during prosecution of Defendant Raft's U.S. Patent Application No. 16/546,326. U.S. Patent No. 9,215,726 is a parent application of the '694 Patent to which the '694 Patent claims priority.

100.     Despite that awareness since May 17, 2021, Defendants continue to infringe and induce others to infringe at least claim 1 of the '694 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '694 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '694 Patent.

101.     SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,414,002

102.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

103.     The '002 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '002 Patent recites:

> 1. A method for ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band, the method comprising:
>
> > receiving a request to transmit a particular message towards a remote receiving device;

encoding the particular message into an encoded message using a format derived to reduce message latency, wherein the encoded message is known to the remote receiving device as representing the particular message, and wherein the encoded message is smaller than the particular message; and

transmitting the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

104. Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '002 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '002 Patent.

105. For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band.



*See* https://www.youtube.com/watch?v=NXAMTsQKvwU&t=587.

106. Defendants jointly and/or individually receive a request to transmit a particular message towards a remote receiving device. Defendants provide communication links to make trades on the world's financial markets. They have established control over antenna stations

positioned in the vicinity of one of the world's largest market centers in Chicago and they transmit communications to remote receiving devices located at other global financial hubs like Frankfurt.

107. Defendants, jointly and/or individually, encode the particular message into an encoded message using a format derived to reduce message latency, where the encoded message is known to the remote receiving device as representing the particular message, and wherein the encoded message is smaller than the particular message.

108. For example, Defendant Raft acknowledges that the messages that it sends are comprised of several bits, and limited to "indicators."



*See The Basics of HF Data Networks*, available at https://raft-tech.com/bulletin/the-basics-of-hf-data-networks/ (last visited May 19, 2026).

109. Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable communication of the particular message, upon information and belief, the encoded message is known to the remote receiving as representing to the particular message.

110. For example, Defendant Raft has acknowledged that it encodes particular messages about the price movement of different financial instruments into encoded messages that are known to remote receiving devices so that information may be utilized for trading.



*See* Mike Schonberg & Tamir Ostfeld, *No Fiber Required: Wireless Market Data from Chicago to London Using HF* (June 2020), https://docs.stacresearch.com/system/files/resource/files/GSL-Spring-2020-Qunicy.pdf.

111.     These messages must be smaller than the particular message, otherwise it would consume the limited bandwidth available and impact latency.

112.     Defendants, jointly and/or individually, transmit the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

113.     Defendants' FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned on or more emission designators, and authorized power levels:

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=143567&license_seq=145364.

114.    The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 96K0 allows a 96 kHz bandwidth. To comply with its FCC licenses, Defendants must use transmission parameters based on the channel bandwidth predefined for the respective frequency range in the ionospheric HF band.

115.    Defendants must also determine transmission parameters based on estimated propagation latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[4] Thus, on

---

[4] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

information and belief, Defendants select message parameters, such as modulation type and frequency while balancing estimated propagation latency with licensing constraints such as the predefined channel bandwidth.

116. Defendants, jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band using the transmission parameters to the remote receiving device.

117. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

118. On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendant is actively controlled by the corporate parent. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

119. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce the other Defendant and/or related entities to infringe the '002 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

120. Defendants have been aware of the '002 Patent at least since May 17, 2021, when an examiner cited U.S. Patent No. 9,215,726 to Defendant Raft during prosecution of Defendant Raft's U.S. Patent Application No. 16/546,326. U.S. Patent No. 9,215,726 is a parent application of the '002 Patent to which the '002 Patent claims priority.

121.    Despite that awareness since May 17, 2021, Defendants continue to infringe and induce others to infringe at least claim 1 of the '002 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '002 Patent.  On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '002 Patent.

122.    SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      A judgment that each Defendant has infringed the Patents-in-Suit;

b.      An injunction barring each Defendant and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the Patents-in-Suit; alternatively, a judicial decree that each Defendant pay an ongoing royalty in an amount to be determined for continued infringement after the date of judgment;

c.      An award of damages adequate to compensate for each Defendant's infringement of the Patents-in-Suit, and in no event less than a reasonable royalty for each Defendant's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.       An award of trebled damages under 35 U.S.C. § 284;

e.       A declaration that this case is exceptional under 35 U.S.C. § 285;

f.       An award of Plaintiff's costs and attorneys' fees under 35 U.S.C. § 285 and other applicable law; and

g.       Any other remedy to which Plaintiff may be entitled.

**<u>DEMAND FOR JURY TRIAL</u>**

SpectraNet demands a trial by jury on all claims and issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 20, 2026

/s/ *Paul J. Skiermont*
Paul J. Skiermont (IL Bar No. 6278464)
Todd A. Martin (TX Bar No. 24066556)
Michael D. Ricketts (TX Bar No. 24079208)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
tmartin@skiermontderby.com
mricketts@skiermontderby.com

Charles C. Koole (CA Bar No. 259997)
**SKIERMONT DERBY LLP**
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4501
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
SpectraNet Technologies LLC

COMPLAINT FOR PATENT INFRINGEMENT                    36